LEE v. LEE.

1. NOVATION—PARTIES—WAIVER.

A father entered into an oral agreement with his son whereby the latter was to stay on the farm with his parents and work it, and both parties were to live out of the undivided profits, and any cash obtained was to be divided one-third to the father and two-thirds to the son, and the son was to pay a certain sum to each of the other children upon the father's death, and have the farm and all the personal property. The father made his will in accordance with the agreement and the son lived on the farm in accordance with the agreement until his death, and his widow continued to live on the farm and operate it the same as her husband had done for two years, when they all left the farm and rented it, the widow receiving the rent. The father left and lived with one of his children and made a new will by which the widow and the children were to inherit the farm at his death and the other children to receive a larger sum each than provided by the first will. The mother died during the life of the son. *Held*, that the father waived any right of homestead or the right to terminate the contract because of no mutuality after death of the son, and that the effect of such waiver was to create a new contract with the widow under the same terms as the original contract with the son.

2. SPECIFIC PERFORMANCE—ORAL CONTRACTS—NOVATION—EQUITY.

Where a father waived his right to have a contract, whereby his married son agreed to live on the farm with the parents and run it, and both parties were to live out of the proceeds of the farm, and all cash received was to be divided between them, one-third to the father and two-thirds to the son, and the son was to have the farm after the father's death, but was to pay each of the other children a stated sum, declared invalid because of lack of mutuality after the death of the son, by allowing the son's widow to live on the farm and manage it the same as the son for two years, when they all left the farm and lived in a home provided by the widow, the mother having died during the son's lifetime, and rented

the farm, the widow receiving the proceeds, and the father left and lived with another child and gave his son-in-law a power of attorney to look after the farm and collect the rent, and changed his will in favor of the widow and her children, but gave each of the other children a larger sum, specific performance of the contract with the widow was decreed, but the father was allowed the rent of the farm during his lifetime and the widow was required to pay interest on the proceeds of personal property sold on leaving the farm, but, at the expiration of the lease, the father was to be allowed the option to require the widow and children to live on the premises under the contract.

Appeal from Livingston; Miner, J. Submitted April 16, 1917. (Docket No. 83.) Decided December 28, 1917.

Bill by Gertrude D. Lee and others against Joseph B. Lee for the specific performance of a land contract. From a decree for plaintiffs, defendant appeals. Affirmed.

*William P. Van Winkle & Son* and *Louis E. Howlett,* for plaintiffs.

*Francis J. Shields* (*Person, Thomas, Shields & Silsbee,* of counsel), for defendant.

BIRD, J. The bill of complaint was filed in this cause for the purpose of enforcing an oral contract to convey a farm of 180 acres, situate in Marion township, Livingston county. The case made by the bill is very well stated by counsel, as follows:

"The plaintiffs are the wife and two sons and sole heirs at law of George W. Lee, deceased. The defendant is the father of George W. Lee, deceased. Defendant, during his active life, was a farmer living in the township of Marion, Livingston county, Mich., and is now 87 years of age. His farm in the township of Marion consisted of 180 acres, upon which he lived for nearly 60 years, and is the property in dispute in

this case. His wife died July 12, 1906. They had six children, five girls, Martha Burnett, Lucy Winchell, and Ida Backus, of Howell, Mich., May Potter, of Lansing, and Lettie Force, of Fowlerville, and one son, George W. Lee. All of these children are now living with the exception of the son. George W. Lee died July 15, 1912, of blood poisoning following the extraction of a tooth, having been a strong, able-bodied man up to within a few days of his death. He was married October 3, 1894, and was then 29 years old. Prior to his marriage George W. Lee had always lived at home and worked for his father upon his farm. After his marriage he and his wife continued to live with his father and mother, all living in the house as members of one family. At that time (1894) all of defendant's daughters had married and left home, except the youngest daughter, Lettie Force, who married and left home about one year after George's marriage. George was working his father's farm on shares, one-third to himself and two-thirds to his father.

"About the year 1896 George Lee became dissatisfied with the arrangement under which he was working, and told his father that unless he could make a more favorable arrangement he would be obliged to leave the farm and start out for himself. His father was then nearly 70 years old, and wished his son to stay on the farm. For the purpose of inducing George to stay, he made the following agreement with him; George was to work the farm, and both families to live out of the undivided products of the farm. The cash from whatever was sold was to be divided two-thirds to George and one-third to his father.

"At his father's death George was to have the farm and all of the personal property and pay to each of the five daughters the sum of $400. George accepted the proposition and remained on the farm continuously thereafter until his death several years later. Immediately following this agreement the house on the farm was made into a double house. George assumed the management of the farm, and both families lived out of the undivided products thereof, and whatever cash was obtained was divided between the father and the son, according to their agreement. Defend-

ant's last will was in accord with this agreement in which he left all his property to his son, George, subject to the payment of $2,000 to the five daughters. This will was shown to his son and his son's wife, who read it in the presence of the mother, and thereafter it was kept in a drawer in the house, where all the family might see it at any and all times for some 17 years, or up to and until after the death of George W. Lee.

"During the years from 1896 until 1912 George W. Lee operated and managed the farm as if it was his own, remodeled the house, rebuilt and enlarged the barn, put up new small buildings, such as corncrib, granary, wagon shed, built a silo, put in a system of running water, built fences, and put in some tile ditch. He paid all the taxes, and did all the work on the place except such light work as the defendant was able to do.

"Mrs. Joseph B. Lee, wife of the defendant, died of a cancer in the year 1896. Prior to her death she was cared for largely by George W. Lee and his wife. After her death the defendant closed his home and lived with his son, George, as a member of his family until his death, which occurred July 15, 1912. After George's death the plaintiffs and the defendants continued to live on the farm as members of one family, working the farm with the assistance of hired help. Gertrude E. Lee (Mrs. George W. Lee), plaintiff, operated the farm, hired the help, paid the taxes, looked after the repairs, and did all things connected with the farm with the consent, advice, and counsel of the defendant. In the fall of 1914 plaintiff and defendant concluded that they could not operate the farm successfully, and decided to rent and leased it to one Cameron for a period of three years from November 1, 1914, for money rent; both plaintiff and defendant signing the lease. Mrs. Lee's parents lived in Lennon, Mich., and she concluded to build a house in Lennon and go there to live, and defendant was to go with her; he consenting to the arrangement and participating in the preparation of the home. She did build her house and go there to live, and defendant went with her.

"Before leaving the farm an auction was held in

the name of Gertrude E. Lee, who advertised the sale
by the usual auction bills. All of the cash and notes
realized from the sale of the personal property were
turned over to Mrs. Lee with the consent and under
direction of defendant. The defendant also directed
the tenant to pay the rent to Mrs. Lee and caused
bills for fencing and other repairs to the farm to be
sent to her.

"After the parties to this suit had been living in
Lennon a few weeks defendant left to visit his daugh-
ter, Mrs. Backus, of Howell. He never returned to
the home of plaintiff, but shortly thereafter gave his
son-in-law, Mr. Backus, a power of attorney to look
after his farm. He changed his will so that the plain-
tiffs should inherit this farm at his death, but charged
with the payment of $5,000 to his daughters instead
of $2,000, as previously provided. Later Mr. Backus
ordered the tenant on the farm not to pay the rent
to Mrs. Lee and made some effort to sell the farm.

"The bill of complaint in this cause was then filed
on January 31, 1916, to enforce the oral agreement;
they offering to continue in the performance of the
said agreement so long as defendant should live. The
estate of George W. Lee was duly probated in the pro-
bate court of Livingston county, and a decree of as-
signment made by said court transferring all prop-
erty owned by him at the time of his death to his
widow and two sons (the plaintiffs here) in equal
shares to each."

At the hearing which followed considerable testi-
mony was taken. A study of the record discloses that
there was very little disagreement between the widow
and defendant as to what was done in fulfillment of
the contract after the death of George. It is worthy
of comment in this connection that the hearing before
the chancellor was not characterized by the usual ill
feeling and bitterness which usually attends the liti-
gation of family affairs. The chancellor was per-
suaded that the contract had been established as al-
leged, and that whatever right the defendant may have
had to object on the ground that the premises in-

cluded a homestead had been waived by him. After reviewing the testimony and acts of the parties at some length his final conclusions are as follows:

"Therefore the court is of the opinion that he has waived any defense which he might have had by reason of the homestead or by reason of his son's death, and that the complainants in this case are entitled to a decree as prayed for in the bill of complaint. But it appearing that the defendant was to have one-third of the net proceeds of the farm, and it also appearing that it was understood that complainant's husband should live on the farm and work it, therefore the court is of the opinion that the defendant should have the rent of the farm now due from the tenant and to become due, he, said defendant, to pay the taxes and to keep the buildings insured for the joint benefit of himself and complainants, and that defendant should have the right to rent said premises or occupy the same and have the net proceeds of the same after paying the taxes and the insurance aforesaid, and this should continue during the life of said defendant.

"The evidence in this case is not clear as to the exact amount of personal property that was on said farm at the time that complainant's husband entered into this contract and began working the farm under the same, and it does not show clearly the amount of personal property belonging to the defendant at the time of the auction sale, but there is some evidence that at the time that complainant's husband took possession of said farm under said agreement the personal property at that time was of the value of $1,000. So in the opinion of the court it is proper that the defendant should receive interest upon the same at 5 per cent. from the date of the auction sale during his lifetime, to be paid by complainants.

"Defendant has the option at the expiration of the lease of said premises by the tenant occupying the same to require complainants to live upon said premises and work the same and live in the house with him, and receive his portion of the net proceeds, being one-third, as originally provided in said contract; but in this case during said time he is to receive no other

income except one-third of the net income of said premises.

"If the defendant shall elect to have said complainants live on said premises at the termination of the lease now in existence by the tenant occupying said premises, he shall make such election within 90 days after the filing of the decree, and file such election with the clerk of said court, and serve a copy of the same upon complainant Gertrude Lee."

We have read the record in this case with much interest, and we think the testimony amply sustains the conclusions of fact arrived at by the chancellor, and if there are no legal barriers in the way, his conclusions should be accepted and approved by this court. The record impresses us that the oral agreement was made as claimed, and that defendant was pleased with it while George lived. They appeared to have gotten along with very little friction of any kind, and it does not appear that defendant changed his mind after George was gone as to where the title should go. He did change his mind as to the amount the daughters should receive from his estate, but he still wished the farm to go to George's family. In pursuance of this he altered his will, and substituted George's family as beneficiaries instead of George, and for two years by word and act recognized them as parties to the contract and accepted their efforts and services as a fulfillment of the terms of the contract. But it is said that after George's death there was no mutuality in the contract. True, upon the death of George the mutuality of the contract disappeared, and had defendant then insisted upon his legal rights the case would now present a different aspect and be more easy of solution, but instead of doing so he substituted new parties in place of George. The new parties accepted the responsibilities and obligations and afterwards paid, and defendant accepted the portion re-

served in the contract as his portion. After doing this ought he now to say that there is no mutuality of contract? After consenting to be substituted in place of George and carrying out the terms of the contract for two years, could the widow be heard to say that she was not bound to carry the contract to completion? We think not.

The situation is no different in my opinion than it would have been had defendant made a written agreement with plaintiffs after the death of George, agreeing therein to do the things he had agreed to do in the original contract, in consideration of their doing the things which were incumbent upon George to do. This, then, is a new agreement with plaintiffs to carry out the terms of an incompleted contract. This new agreement was made after the death of defendant's wife, and therefore involves no question of homestead. The testimony shows that this new agreement was performed upon the part of plaintiffs until interrupted by the act of the defendant, and that they stand ready to go forward and complete it. While it is not usual to grant relief against one who has agreed to convey property under such circumstances, it is permissible where great injustice may follow if relief be denied. We think this case comes within that class, and that relief therein is justified by our recent holding in *Hogan* v. *Hogan*, 187 Mich. 278 (153 N. W. 678).

As the chancellor reached the right conclusion, the decree will be affirmed, with costs to plaintiffs.

KUHN, C. J., and STONE, OSTRANDER, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.